**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PORTIER, LLC,<br><br>                              Plaintiff,<br><br>        v.<br><br>CITY OF NEW YORK,<br><br>                              Defendant. | No. 21 Civ. _____<br><br><br>**COMPLAINT AND DEMAND FOR A JURY TRIAL** |

       Plaintiff Portier, LLC, by and through its undersigned counsel, for its complaint against Defendant City of New York, alleges as follows:

## INTRODUCTION

       1.       In defiance of constitutional limitations and despite the objections of privacy, civil rights, and community groups, New York City enacted an unprecedented ordinance compelling Uber Eats, Postmates, and other third-party food ordering and delivery platforms to turn over troves of private, commercially valuable, and sensitive user data to local restaurants while providing virtually no protections for that data and no compensation for its value. *See* N.Y.C. Admin. Code §§ 20-563.7, 20-847.3 (together, the "Ordinance"). The data that Uber Eats and Postmates will be compelled to provide includes each user's name, phone number, email address, and street address, and the contents of each order. The Ordinance mandates this sweeping disclosure unless the user affirmatively opts out *each and every time* the user places an order, regardless of whether the restaurant has in place any measures to appropriately protect it. Indeed, the Ordinance not only fails to require that restaurants implement safeguards to protect such data, but also prohibits platforms from requiring any such safeguards or prohibiting any uses of such data. By forcing platforms to divulge this valuable and sensitive data—which Uber itself goes to great lengths to obtain and protect—in such a careless and unprotected manner, the Ordinance

1

impermissibly rewrites the agreements between the platforms and the restaurants they serve and runs roughshod over the privacy interests of individual users throughout New York City. The City Council's misguided effort to favor local businesses over platforms and even individual citizens thus tramples on privacy and data security norms of paramount importance and violates the Constitution in multiple respects.

2.     *First*, the Ordinance violates the Contract Clause by permanently altering and disrupting Uber Eats' contracts with their New York City restaurant partners. Uber Eats offers platforms through which users can find, explore, and transact with local restaurants. Users trust Uber Eats with sensitive personal data as they use the platforms, including not only their identifying and contact information, but also information reflecting what they order for delivery to their homes, for how many people, and at what times. That data is subject to Uber's Privacy Notice and is protected by complex systems and safeguards that Uber has built as a large international technology company subject to a vast array of privacy laws and requirements. Thus, users can have confidence in Uber Eats' ability to secure their data and honor their choices as to how that data is used and disclosed. That user trust is important to Uber Eats' business, and central to Uber Eats' ability to build and maintain its consumer customer base.

3.     Uber Eats' contractual arrangements with its restaurant partners are built on that foundation. Under those contracts, in exchange for certain fees, Uber Eats provides a variety of services, including a marketplace platform that enables not only the transmission of food orders from customer to restaurant and from restaurant to delivery courier, but also a full suite of technology services to assist restaurants with day-to-day operations and marketing efforts to reach new customers and retain existing ones. These services have helped countless restaurants survive

and grow, even during the COVID-19 pandemic. Indeed, Uber Eats is deeply committed to the success of restaurants on its platform.

4.      The Ordinance dismantles these complex contractual arrangements, demolishing the reasonable and settled expectations of all involved. It compels Uber Eats to simply hand over private, sensitive, valuable customer data which restaurants are not contractually entitled to and have not paid for, and which Uber Eats has spent significant resources acquiring, developing, and protecting. In doing so, the Ordinance undermines user privacy and data security, and thus consumer trust in the platform. And it guts the economic value of marketing and data analytics services that New York City restaurants contract to receive from Uber Eats. The City claims that its goal is to further assist local restaurants as they emerge from the pandemic, but there are any number of narrowly drawn ways to achieve that end that do not permanently alter the contractual relationships that are the backbone of Uber Eats' business in New York City.

5.      *Second*, the Ordinance violates the First Amendment. In plain terms, the Ordinance compels platforms to speak—*i.e.*, to disclose specific customer data and information to other market participants. The City's ostensible goal of favoring one set of contractual parties (local restaurants) at the explicit expense of both third-party platforms and individual users is incompatible with the First Amendment. And the City's impermissible means—the forced disclosure of troves of valuable and sensitive personally identifying user data—are just as objectionable as its unconstitutional ends.

6.      *Third*, the Ordinance violates the Takings Clause. The personal data that users have entrusted to Uber Eats constitute trade secrets, which required significant investment and expenditure to accumulate. The Ordinance plainly interferes with Uber Eats' exclusive and economic use of those trade secrets—indeed, the Ordinance effectively seizes those trade secrets

and turns them over to other market actors, with the explicit aim of driving those market actors' profits and with zero compensation to Uber Eats.

7.     *Fourth*, the Ordinance violates the Dormant Commerce Clause. As the legislative history makes clear, the Ordinance is an effort to secure benefits for local businesses at the explicit expense of interstate ones. Its animus toward interstate platforms is palpable and impermissible.

8.     *Fifth*, the Ordinance violates the New York Constitution and the Municipal Home Rule Law, because it oversteps the permissible boundaries for legislation by the New York City Council. The police power provides the City the authority to protect the community and promote its welfare by regulating businesses, but the Ordinance does the opposite—it *threatens* the privacy and security of the community in order to give a windfall to certain businesses. And even if that were a permissible end, given the availability of narrower alternatives that would protect user privacy, the Ordinance's means of benefiting local businesses are tenuous at best.

9.     For the reasons set forth further herein, the Ordinance should be declared unconstitutional, both on its face and as applied, and should be enjoined, and damages should be awarded to Uber Eats for the harms it suffers.

## THE PARTIES

10.     Plaintiff Portier, LLC ("Uber Eats") is a Delaware company founded in 2014 and headquartered in San Francisco, California. Uber Eats is a wholly owned subsidiary of Uber Technologies, Inc. ("Uber"). Postmates, which was acquired by Uber Technologies, Inc., assigned its rights in merchant agreements to Uber Eats. Uber Eats' online marketplace platforms (operating under the Uber Eats and Postmates brands) connect restaurants and other merchants to consumers and a network of independent delivery people in their communities. Consumers can access the Uber Eats platforms via websites or mobile applications on a smartphone. Uber Eats provides various services to restaurant partners with which it enters contracts. Uber Eats falls within the

definition of a "third-party food delivery service" under New York City Administrative Code §§ 20-563 and 20-845.

11.     Defendant City of New York (the "City" or "New York City") is a municipal corporation organized and existing under and by virtue of the laws of the State of New York.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Uber Eats' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Uber Eats alleges violations of its rights under the Constitution and laws of the United States.

13.     This Court has subject matter jurisdiction over Uber Eats' state law claims pursuant to 28 U.S.C. §§ 1332 and 1367 because the parties are completely diverse from one another and the amount in controversy exceeds $75,000, and because the state law claims are so related to the federal claims asserted in this action that they form part of the same case or controversy under Article III of the United States Constitution.

14.     The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and under the Court's inherent equitable jurisdiction.

15.     Venue is proper under 28 U.S.C. § 1391 because the defendant is located and resides in this judicial district and in the State of New York, and because a substantial part of the events giving rise to the claims for relief occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.     Uber Eats Connects Customers and Restaurants through a Secure Platform that Protects Data Privacy**

16.     Uber Eats is a technology company that connects consumers, restaurants, and couriers. Consumers access the Uber Eats platforms (operating under both the Uber Eats and

Postmates brands) online or through smartphone applications, and they use the platforms to find and transact with local restaurants. The platforms offer consumers benefits, including but not limited to the ability to discover new restaurants, gain access to special offers and discounts, read reviews, and use one app or website to order from numerous merchants, rather than having to fill out delivery and payment details anew for every order, let alone call on the phone, be placed on hold, and order without menu information.

17.     Uber has made significant investments to grow its consumer base in New York City, including with respect to constant innovation, improvement of its apps, and marketing and advertising across multiple channels like TV, out-of-home, and social media.

18.     Additionally, as a large interstate and international technology company, Uber is subject to rigorous data security and privacy laws and regulations in numerous jurisdictions, and it has developed sophisticated compliance systems to meet those obligations. Thus, users can have confidence that the personal data that they disclose while using the Uber Eats platforms will be properly managed in a secure manner respectful of their privacy and in line with industry standards.

19.     Uber Eats also makes efforts to maintain its consumers' trust through transparent data security and privacy policies. Uber's Privacy Notice is disclosed to new users during the enrollment process and to returning users on the sign-in page, and is easy to find in a linked footer on Uber's website or to view through Uber's app. The Privacy Notice clearly delineates the categories of user information that Uber collects. And the Privacy Notice explains that collected data is used internally for a set of specific objectives, for example: "to enable reliable and convenient transportation, delivery, and other products and services . . . [;] to enhance the safety and security of our users and services; for customer support; for research and development; to enable communications between users; to send marketing and non-marketing communications

to users; [and] in connection with legal proceedings." The Privacy Notice also provides explanations and examples of how Uber uses the data collected for each of these objectives, so that consumers can have a better understanding of what they mean in practice.

20.     Uber's Privacy Notice further outlines its data sharing and disclosure policies, with respect to particular data recipients such as account owners, Uber subsidiaries, and business partners. When it comes to delivery orders, Uber Eats shares information for "order fulfillment, delivery, communications and marketing purposes," among other reasons, as stated in the Uber Privacy Notice. Further, the Privacy Notice explains that users may opt in to receive communications from certain restaurants while using Uber Eats to order, and that those who opt in may also choose to cease receiving such communications through settings accessible in the Uber Eats app. The Privacy Notice states in plain terms that Uber does "not sell users' personal data to, or share it with, such partners or others for purposes of their own direct marketing or advertising, except with users' consent"—that is, unless the user affirmatively opts in to such disclosure.

21.     Uber's transparency with respect to privacy and data security extends beyond the Privacy Notice. For example, in its 2021 ESG Report, which addresses environmental, social, and governance matters important to stakeholders, Uber explained that its "information security program, which is based on the industry-recognized ISO 27001/2 framework, includes written policies, processes, and standards designed to protect the security, confidentiality, and integrity of Uber's data environment." The ESG Report further emphasized the importance of users' "control over how their personal data is used for marketing purposes."

22.     Thus, when a consumer places an order through Uber Eats, and submits personal information as part of that order, they can have confidence that their data will be used and protected in an appropriate manner, as stated in the Uber Privacy Notice and ESG Report. Uber's consistent,

secure, and transparent approach not only protects consumer privacy and data security, but also gives customers choices about use of their data, and thereby builds reliability and trust that encourage users to return to the platform to order goods and food from restaurants and other merchants.

**B.      Uber Eats Enters into Contracts with Restaurant Partners to Provide Valuable Technology Services**

23.      When a restaurant enters into a contractual relationship with Uber Eats, the restaurant gains access to Uber Eats' large community of consumers. Many consumers use Uber Eats to discover what to eat—treating the app as a guide to local restaurants, and then as a tool for placing an order for delivery or pick up. Access to this large community of potential new customers is highly valuable in itself.

24.      Uber Eats also offers its restaurant partners access to various technology services that help restaurant (and merchant) partners receive and fulfill delivery orders, manage day-to-day business operations, analyze sales trends, and market their offerings to new and existing customers. These services, along with other assistance offered by Uber Eats, provided important support for New York City restaurants during the COVID-19 pandemic.

25.      For starters, Uber Eats provides services that facilitate the delivery of food orders. Generally, when a user places a delivery order from a participating restaurant through an Uber Eats platform, Uber's technology matches the eater with a nearby courier who can then decide whether to pick up the food and deliver it to the user. (The Uber Eats marketplace also allows users to place pick-up orders with merchants or for merchants to use their own couriers to fulfill delivery orders.) Couriers receive only limited information in order to complete a delivery and cannot use that information for other purposes. These ordering-related services benefit restaurants in all sorts of ways, such as by removing operational burden and allowing restaurants to benefit from online

delivery and pickup orders without having to build the necessary infrastructure from the ground up.

26.     Uber Eats also provides restaurants the option to create and monitor targeted marketing campaigns through a suite of tools called Uber Eats Manager. These tools enable restaurants to, among other things, set up loyalty programs that give repeat users discounts and free items, which can help grow a restaurant's sales.

27.     Restaurant partners can also gain access to performance data through Uber Eats Manager. They can review sales, order volume, and ticket size data; operations over time; heatmaps of order issues; and various leaderboards. They can also see top-selling items by order volume, menu item feedback including various ratings metrics, and total customers broken down by returning and new customers.

28.     Uber Eats also uses its valuable consumer data to perform in-depth data analytics addressing sales and customer insights, which restaurant partners can contract for access to. Customer insights include a "conversion funnel" showing restaurants how many customers viewed their menu, added items to an order, and placed an order. For new consumers, Uber Eats can show restaurants how many new customers ordered from the restaurant in the time period selected and how that datapoint compares to a previous time period. Uber Eats can also display customer retention graphs that illustrate how many customers placed, for example, their first, second, third, and fourth order in a selected time period.

29.     Uber Eats offers these tools through various pricing structures tailored to meet a restaurant's particular business needs. In other words, Uber Eats is not "one size fits all"; its contracts with restaurants are priced according to the specific services that a restaurant selects. Service packages selected by Uber Eats' restaurant partners involve combinations of marketing

and advertising services, payment and order processing, customer support services, data and operational analysis, and facilitation of delivery workers' fulfillment of customer orders. Although a narrow subset of Uber Eats' New York City restaurant partners negotiate contractual arrangements that provide access to certain limited data—associated with consumers who have affirmatively opted in to such disclosure—in exchange for value and with data protection assurances, generally Uber Eats' contracts do not provide for such access. And none of Uber Eats' contracts with restaurant partners entitles them to obtain the sort of free, direct, ongoing, and unrestricted access to the private, sensitive consumer data that the Ordinance compels Uber Eats to hand over.

30.    Regardless of which package a restaurant partner chooses, nothing bars it from using more traditional business tools as well. For example, a restaurant is still able to include hard-copy takeout menus, promotional offers, and other advertising materials in its delivery packages, whether or not an order is placed and delivered through a third-party platform like Uber Eats.

**C.    The Ordinance Explicitly Seeks to Disrupt Uber Eats' Contractual Arrangements with Restaurants**

31.    The Ordinance dramatically and permanently alters Uber Eats' multifaceted contractual arrangements with its New York City restaurant partners. Indeed, the Ordinance is explicitly designed to rewrite those contracts in order to benefit one party (the local restaurant) at the expense of the other (the platform). And in doing so, the Ordinance harms not only the platforms but also their users.

32.    On May 12, 2021, New York City Council Member Keith Powers introduced the bill that would become the Ordinance, as part of a legislative package to protect food-delivery

workers. *See* Comm. on Consumer Affairs & Bus. Licensing, Briefing Paper and Comm. Rep. of the Gov't Affairs Div. at 3 (June 8, 2021) ("June 8 Comm. Rep.").[1]

33.     The bill aimed to permanently reshape the relationship between third-party platforms like Uber Eats and New York City restaurants by mandating that the platforms turn over private information about their users for no compensation. *See* N.Y.C. Int. No. 2311 (2021).

34.     From the beginning, the City Council Committee on Consumer Affairs and Business Licensing made clear that the bill was aimed directly at the "contract terms" between restaurant owners and third-party platforms. *See* June 8 Comm. Rep. at 10. The Committee acknowledged that third-party platforms "assert ownership over all orders placed through their products" and the resulting customer data, *id.*, and that they use that data to "enhance their own services and produce more efficient, profitable systems." *Id.* at 12. Nevertheless, the Committee concluded that compelling third-party platforms to hand "crucial" user information to restaurants would "enable restaurants to conduct specific outreach to retain . . . customers," make business decisions, and "drive future profits for restaurant owners." *Id.* at 10–11.

35.     The City Council deliberately placed the burden of that profit-generating objective on third-party platforms such as Uber Eats that are based out-of-state. Chairperson Diana Ayala of the Committee on Consumer Affairs and Business Licensing introduced the legislative package as containing "a number of bills related [to] third-party delivery platforms, such as Grub Hub, DoorDash, and Uber Eats," Transcript of the Minutes of the Comm. on Consumer Affairs and Bus. Licensing, City Council, City of New York, at 5–6 (June 8, 2021), and Council Member Keith

---

[1] The legislative history materials cited herein are available on the New York City Council's website. *See* Int. 2311A-2021, Leg. Research Ctr., New York City Council, https://legistar.council.nyc.gov/LegislationDetail.aspx? ID=4951001&GUID=4CB11989-5925-418B-9627-B2AED230D67F&Options=&Search= (last visited Dec. 1, 2021).

Powers recognized the goal of the legislation to help "restaurants and our local businesses," *id.*
at 20. Indeed, the City Council explicitly acknowledged that the Ordinance was aimed at "major
food delivery TPPs—Uber Eats, DoorDash, and Grub Hub," June 8 Comm. Rep. at 6, which it
ultimately concluded each "account for approximately a third of all online food orders" in New
York City, Comm. on Consumer Affairs & Bus. Licensing, Comm. Rep. of the Gov't Affairs Div.
at 4 (July 29, 2021) ("July 29 Comm. Rep."). In other words, the bill targeted third-party platforms
operated by out-of-state entities, who were understood to account for virtually all of the online
food orders that fell within the bill's purview.

36.     The proposed bill did not impose any requirement whatsoever on New York City
restaurants to protect the privacy of the users whose data—including name, telephone number,
email address, delivery address, and the contents of their order—would be disclosed. It did not
allow users of the third-party platforms to opt out of having their private information turned over
to restaurants; did not require restaurants to safeguard any private information they received; did
not limit to whom restaurants could disclose the information; did not provide restaurants with
training or information on best practices for safeguarding private customer information; did not
require restaurants to notify customers if their private information was compromised or wrongfully
disclosed; and did not regulate how that information could be used or when it would need to be
destroyed. *See* N.Y.C. Int. No. 2311 (2021).

37.     Nor did it allow third-party platforms themselves to uphold essential promises to
their users about protecting their private information. Instead, it expressly prohibited third-party
platforms from "limit[ing] the ability of [restaurants] to download and retain such data, or
limit[ing] their use of such data for marketing or other purposes outside the [third-party platform's]
website, mobile application or other internet service." *Id.* § 2.

38.     While the commercial harm of the bill to Uber Eats is clear, technology and privacy experts expressed grave concern about customer privacy in voicing their strong opposition to the bill. For example, the Electronic Frontier Foundation ("EFF") and Tech:NYC testified:

> The bill fails to provide any security requirements for restaurants after they receive personal information or how they must store information. For example, information could be stored on a computer that does not require a password, that is regularly accessed by multiple people, or located at the front of the restaurant where it could be easily accessed by anyone when staff isn't looking. The bill simply assumes that restaurants have the technical capacity to download this information and store it in a way that will not allow for unauthorized individuals to access it. Even if they voluntarily choose to do so, not all restaurants will have the resources to invest in a secure operating system to download and keep this information secure.

*Protections for Delivery Workers and Introductions 2163, 2288, 2289, 2294, 2296, 2298, 2311: Hearing Before the Comm. on Consumer Affairs and Bus. Licensing*, Int. 2311-2021 at 44 (June 8, 2021) ("June 8 Hearing").

39.     EFF and Tech:NYC further explained that "most concerning is that the bill is silent on notice to consumers if their personal information held by a restaurant is accessed by a third party without the restaurant's permission." *Id.* at 45. Such information "is *not* covered by the New York State Shield Act . . . [meaning] that there could be a security breach and no notice would be provided to customers that their name, address, email address, and telephone numbers had been improperly disclosed to a person or entity." *Id.* (emphasis added).

40.     EFF and Tech:NYC also recognized that the bill would upset consumer expectations. They testified that the bill "forces consumer data to be shared with food facilities for little or no benefit to the consumer. Consumers who utilize a platform do not expect that their information will necessarily be shared with any food facility that they order from, nor do these consumers necessarily want to receive communications from every restaurant they order from." *Id.*

41.     Civil rights groups also raised serious concerns related to the bill. For example, the National Action Network, the New York Urban League, and Arc of Justice stated that the bill was "particularly concerning for communities of color, vulnerable populations and undocumented immigrants" since "[t]heir safety could be in danger if this bill proceeds in its current form."[2] GMHC and the National LGBTQ Chamber of Commerce explained that "the ability of our clients to keep their personal information private and confidential is often directly linked to their safety and security," making the bill "particularly problematic for a community that has already faced heightened risk in navigating confidentiality and security in an online environment."[3]

42.     The bill also faced opposition from the out-of-state third-party platforms on which the data disclosure requirement would be imposed. Uber Eats, DoorDash, and Grubhub each raised concerns before the City Council.

43.     An Uber representative testified that "Uber Eats welcomes a conversation with the New York City Council on the topic of third party food delivery" and was "largely supportive of many of the bills" in the package, but had "major concerns" about the data-sharing mandate. June 8 Hearing at 23–24. As the representative explained, "Uber has invested significantly in data security, and has an established data security and privacy program that is subject to strict laws such as the EU's GDPR and California's CCPA, but New York State does not have any similar data protection laws in place. This means that the restaurants that receive this data would not be subject

---

[2] Stephon Johnson, *DoorDash, Activists and Privacy Advocates Denounce Data Sharing Bill*, N.Y. Amsterdam News (July 29, 2021), https://amsterdamnews.com/news/2021/07/29/doordash-activists-and-privacy-advocates-denounce; *see also* Sam Pierre, Op-Ed, *Council's Data Bill Will Harm Vulnerable New Yorkers*, AMNY (July 27, 2021), https://www.amny.com/opinion/op-ed-councils-data-bill-will-harm-vulnerable-new-yorkers; Cindy Rubi Estrada, *New York City Hispanic Chamber of Commerce Letter to Protect Consumers and Businesses*, Harlem World Mag. (July 27, 2021), https://www.harlemworldmagazine.com/new-york-city-hispanic-chamber-of-commerce-letter-to-protect-consumers-and-businesses.

[3] Matt Tracy, *Council Passes Restaurant Data Sharing Bill Opposed By GMHC, NGLCC*, Gay City News (July 29, 2021), https://www.gaycitynews.com/council-passes-controversial-restaurant-data-sharing-bill-opposed-by-gmhc-nglcc.

to any such data protection requirements. . . . All of this would put our users' data at much greater risk." *Id.* at 24.

44.     Grubhub and DoorDash representatives raised similar privacy concerns. *Id.* at 19–21.

45.     Third-party platforms also objected to the bill based on their business interests and existing contractual relationships with restaurants. Along those lines, the Uber Eats representative explained different ways that the City could "allow restaurants to market directly to their consumers" and "grow their businesses" such as "prohibit[ing] app companies from preventing restaurants from including flyers and other direct marketing in the bags being delivered to their customers" or sharing general information that was "useful to restaurants, but doesn't provide personally identifiable information." *Id.* at 24.

46.     Following the hearing, on July 22, 2021, the Committee proposed an amended bill that kept the main components of the original proposal—including its fundamental flaws. *See* NYC Int. No. 2311-A (2021). The amended bill still compelled third-party platforms to provide their customer data to restaurants, and other than the minimal requirement that restaurants not "sell, rent, or disclose" customer data "in exchange for financial benefit," it still put no guardrails in place to protect the sensitive customer information. *Id.* § 1(d). In fact, rather than fixing the significant privacy issues, the amended bill introduced *additional* problems by mandating that third-party platforms "share customer data [with restaurants] . . . in a machine-readable format, disaggregated by customer, on an at least monthly basis." *Id.* § 1(c).

47.     In a subsequent report, the Committee recognized third-party platforms' "ownership" interest in the "all orders placed through their products" and the attendant data, and even acknowledged that "[o]wnership of data of thousands of restaurants in a city also enables

[third-party platforms]" to develop their products by "creat[ing] targeted restaurant concepts that exist" on the platforms. July 29 Comm. Rep. at 7–8. But despite this ownership interest and the great "value of customer data" to third-party platforms, *id.* at 8, the Committee resolved to hand a windfall to restaurants by compelling third-party platforms to give up their valuable assets to "drive future profits" of restaurants, *id.* at 9.

48.     The City Council approved the amended bill, with 35 members voting in favor, 8 abstaining or absent, and 6 voting no. Council Member Kalman Yeger voted no because the Ordinance imposed a "contract of adhesion" that would "forc[e] the consumers who do not know that their data is being handed over to restaurants for permanent keeping to have that data . . . handed over"; as a result, the Ordinance was not only "not a consumer-friendly bill," but, if anything, "an anti-consumer bill." Transcript of the Minutes of the Comm. on Consumer Affairs and Bus. Licensing, City Council, City of New York, at 15–16 (July 29, 2021). Even some of the votes in favor of the bill came from Council Members who expressed serious concerns about privacy, including Council Member Helen Rosenthal, who voiced hope that the Ordinance would be amended "to further protect people's privacy." Transcript of the Minutes of City Council Stated Meeting, City Council, City of New York, at 41 (July 29, 2021); *see also* July 29 Council Hearing at 38 (comments by Council Member Carlos Menchaca noting "privacy [concerns] relating to immigrants," including "protecting data from federal agencies like ICE and DHS, who have been connected to deportations of our neighbors").

49.     At no time prior to passage of the Ordinance did the City Council debate alternative legislation that would have boosted the restaurant industry without forcing third-party platforms to disclose data that the platforms owned (or that would have imposed privacy and data security

standards on restaurants once they received the data). There are any number of such alternatives. *See supra* ¶ 45; *infra* ¶ 70.

50.     The bill became law on August 29, 2021, and is set to take effect on December 27, 2021. *See* N.Y.C. Local Law 2021/90, *codified at* N.Y.C. Admin. Code § 20-847.3; *see also* N.Y.C. Local Law 2021/92, *codified at* N.Y.C. Admin Code § 20-845.

51.     Following that enactment, on September 27, 2021, the Council passed a new law imposing a licensing requirement on all third-party delivery services and reorganizing relevant Administrative Code subchapters. *See* Local Law 2021/100, § 2, *codified in relevant part at* N.Y.C. Admin. Code §§ 20-563, 20-563.7. When that new law goes into effect on January 24, 2022, it will repeal the subchapter of the Administrative Code that contains the Ordinance and reincorporate those same requirements into code provisions that require third-party platforms to obtain a license in order to do business in the City. *Id.* § 2. The definition of "customer data" and the substantive data disclosure requirements remain the same. *Id.* The definition of "third party delivery service" from the licensing law—"any website, mobile application or other internet service that: (i) offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, a food service establishment; and (ii) that is owned and operated by a person other than the person who owns such food service establishment," N.Y.C. Admin. Code § 20-563—replaces an earlier definition from the data disclosure law, *see id.* § 20-845. The new law also adds, among other things, revocation, suspension, and denial of a license as remedies for violations of the Ordinance. *Id.*

**D.     The Ordinance Causes Significant and Irreparable Harm to Uber Eats**

52.     The Ordinance as passed substantially impairs Uber Eats' contracts with New York City restaurants and harms Uber Eats' business in at least two fundamental ways. *First*, the compelled disclosure of private and sensitive user data to entities with unknown and likely

immature or non-existent data security and privacy practices threatens the data security and privacy of Uber Eats' customers, undermining the trust that fosters customer engagement and loyalty, which is important to Uber Eats' business. This threat is compounded by the fact that compelled disclosure is the default, and the only mechanism for a user to escape it requires the user to affirmatively opt out each and every time the user places an order—as opposed to an opt-in disclosure mechanism. *Second*, the Ordinance forces Uber Eats to turn over proprietary data that it uses to develop and provide marketing, data analytics, and other services to restaurant partners, thereby gutting the economic value of the data and those services, without any compensation to Uber Eats. By design, the Ordinance aims to allow restaurants to capitalize on Uber Eats' investment and use Uber Eats' data to, among other things, market directly to Uber Eats' users.

53.     As to the first harm, the Ordinance maximizes the scope of disclosure while minimizing consumer protections, creating a powder keg of data insecurity and privacy risk. Under the Ordinance, any restaurant partner that wants customer data can request it from the third-party platform. And upon such a request—no matter what the contract between the platform and restaurant says, and without regard for the privacy preferences purposely selected by the user— the platform must "provide to the [restaurant] all applicable customer data, until such [restaurant] requests to no longer receive such customer data." N.Y.C. Admin. Code § 20-563.7(a); *see also id.* § 20-847.3(a). "Customer data" under the Ordinance means name, telephone number, email address, the delivery address, and the contents of the customer's online order. *Id.* §§ 20-563, 20-845.

54.     To facilitate this compelled disclosure of customer information, the Ordinance also provides that users of a third-party platform "shall be presumed to have consented to the sharing of" customer data for "all online orders." *Id.* §§ 20-563.7(b), 20-847.3(b). Users can "request that

[their] data not be shared in relation to [an] online order," but only "in relation to a specific online order." *Id.* §§ 20-563.7(b), 20-847.3(b). This means that *every single time* a consumer places an order, she must remember to opt out of sharing her data; if she forgets one time, her data may be shared and thus be owned by the restaurant forever, unless she requests that the restaurant delete it. This approach contravenes well-established practices relating to privacy, because its asymmetry significantly increases the chance that a customer will inadvertently permit disclosure of her personal information where she did not intend to do so.[4]

55.     Moreover, as noted above, once a restaurant requests the customer data for a third-party platform's users, the Ordinance obligates the platform to make that data available in a specific format that compounds the harm to privacy and data security. Uber Eats must collect and present data in a "machine-readable format, disaggregated by customer, on an at least monthly basis," so that restaurants have the ability to "download and retain such data." *Id.* §§ 20-563.7(c), 20-847.3(c).[5] This mandatory format proliferates compilations of sensitive data to countless private actors with no data security protections, creating snowballing risks of hacking and other intrusion and compromise. This mandatory format also facilitates misuse. For example, beyond disclosing where a person lives, such amalgamated data could allow a restaurant employee (or anyone else who comes into possession of the data, such as hackers) to identify trends about when a particular individual is or is not home (based on when she orders), how many other individuals are with her (based on how much she orders), and who those individuals might be (based on

---

[4] Asymmetry echoes throughout the Ordinance. For example, the Ordinance does not impose any public outreach requirement to educate New Yorkers about this shift in the data privacy landscape—even though it *does* impose an outreach requirement to notify restaurants of their expanded access to customer data. *See id.* § 20-563.13.

[5] This will require Uber Eats to design and engineer a system for collecting and sharing user data with restaurants— which itself gives rise to substantial cost. Uber Eats will also have to design and engineer a system for users to opt out of sharing their data, and this opt-out and any related disclosures will consume valuable digital real estate on Uber Eats' apps.

different users ordering to the same address in the same general time period). This goes far beyond the sort of customer data maintained by typical restaurants in the days when individuals called a local restaurant and placed a delivery order.

56.     These security concerns are further heightened by the Ordinance's lack of meaningful controls as to further dissemination to individuals beyond the requesting restaurant. While the Ordinance bars restaurants from "sell[ing], rent[ing], or disclos[ing]" "customer data to any other party in exchange for financial benefit" without the customer's consent, *id.* §§ 20-563.7(d), 20-847.3(d), it places *no other limits* on what a restaurant can do with the customer data it obtains. It fails to mandate even a single privacy safeguard. And third-party platforms cannot take steps to protect their users' privacy either, as the Ordinance actively prohibits platforms from imposing limitations on restaurants' use of their users' data, regardless of any existing contractual protections and regardless of the users' stated preferences. *Id.* §§ 20-563.7(c), 20-847.3(c). Thus, a user who has previously opted out of marketing communications from certain restaurants could be barraged by marketing communications from those very restaurants because of the compelled disclosure of their personal information pursuant to the Ordinance. And a user will have no idea—and no way of determining—who gains access to deeply personal information about her daily life, and for what purposes, and what, if any, privacy and security controls may be in place at these third parties.

57.     Moreover, New York law does not independently impose data security and privacy requirements applicable to these circumstances, and the Ordinance does not require restaurants to comply with the requirements and standards maintained by Uber Eats. Nor does the Ordinance require restaurants who request customer data to certify having any data protection and privacy policy or practices in place at all.

58.     Finally, in contrast to Uber Eats and other platforms, which disclose their data security and privacy policies, restaurants typically do not disclose any such policies on their websites, and even if they did, consumers would not need to visit those websites to place an order through Uber Eats' apps. Thus, consumers will generally be unable to make an informed risk assessment as to the possibility of a data breach involving their personal information.

59.     As set forth above, the compelled disclosure of such sensitive information undermines the user trust that is foundational to Uber Eats' business. In so doing, it reduces the value of the investments Uber Eats has made in building its user base and protecting users' privacy and data security.

60.     In addition to these important user privacy and security concerns, the Ordinance requires Uber Eats to turn over its proprietary, confidential trade secrets to its contractual counterparties without any compensation for its value. The Ordinance thus obliterates Uber Eats' investment in developing and protecting its proprietary data, and alters the fundamental bargain between Uber Eats and New York City restaurants.

61.     As outlined above, the technology services that Uber Eats offers to restaurant partners are data-driven, and Uber Eats uses the same data internally for determining and testing potentially viable future services and marketing its own platform. Thus, the data at issue is what fuels the innovation that Uber Eats offers to the benefit of its partners and is used for its own marketing and advertising.

62.     By mandating the provision of data that is central to Uber Eats' services for no compensation, the City Council effectively rewrites Uber Eats' contracts with restaurant partners, without regard for consideration, the parties' intent, or the broader economic structure that the

parties rely on to negotiate the exchange of value. Indeed, once disclosed, that data will immediately and irreparably lose a significant part of its economic value.[6]

63.     Despite all of these serious harms, the Ordinance leaves platforms with no choice but to comply with its mandate. It imposes severe penalties on third-party platforms that resist disclosure, no matter the basis for that resistance. Any third-party platform that fails to comply with the Ordinance faces a civil penalty of $500 per restaurant, per day. *Id.* §§ 20-563.10, 20-848(a). There is no exemption or safe harbor provision whereby, for example, a third-party platform may refuse disclosure to a restaurant that has had a data breach or has made improper use of the prior user data to which the restaurant gained access.

64.     In addition, starting in January 2022, third-party platforms must obtain a license to operate a food delivery service within the City. *Id.* § 20-563.1. Any third-party platform that commits two violations within a two-year period may have its license suspended or revoked, or its application for a renewed license denied. *Id.* § 20-563.9.

65.     These harms are imposed only on third-party platforms like Uber Eats, all or almost all of which are out-of-state businesses. *See* N.Y.C. Admin. Code §§ 20-563, 20-845.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF THE CONTRACT CLAUSE
### OF THE UNITED STATES CONSTITUTION

66.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

67.     Article I, Section 10 of the United States Constitution prohibits state and local governments from "pass[ing] any . . . Law impairing the Obligation of Contracts." The Contract

---

[6] The Ordinance also injects uncertainty into Uber Eats' ability to contract with restaurant partners in the future. If interventionist government actors, with an apparent hostility towards third-party platforms, are permitted to rewrite their contracts and seize their most valuable data, it sets the stage for further interventions without warning.

Clause imposes limits on the power of state and local governments to "abridge existing contractual relationships." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).

68.     Courts apply a three-step test to determine whether a law acts as an unconstitutional abridgement of a contract: first deciding whether the law is a "substantial impairment" of a contractual relationship, second considering whether the law "serves a significant and legitimate purpose," and third addressing whether the law is drawn in "reasonable and appropriate means" to advance that purpose. *Melendez v. City of New York*, 16 F.4th 992, 1032–47 (2d Cir. 2021).

69.     The Ordinance operates as a substantial impairment of the contractual relationship between Uber Eats and New York City restaurants. Indeed, from the beginning, it set out to address the "contract terms" between three major third-party platforms and local restaurants, with the explicit purpose of "driv[ing] future profits" of the restaurants. The Ordinance requires Uber Eats to disclose highly valuable, sensitive, personal information about its users, the privacy and security of which is foundational to Uber Eats' business. The forced disclosure of that data also fundamentally and permanently reduces the economic value of various technology services that Uber Eats offers relating to marketing and data analytics. And that information, once given, is given permanently.

70.     There are more narrowly drawn means to achieve the City's stated purpose of helping New York City restaurant owners: economic incentives, such as tax breaks or grants; regulations protecting restaurants' inclusion of direct marketing materials in delivery packages; or information-sharing that is useful to restaurants but stops short of personally identifiable customer information. Instead, the Ordinance compels platforms to turn over troves of their most sensitive data with no protections and for no compensation, imposing an enormous "economic burden" on

"a discrete group" of market actors. *Melendez*, 16 F.4th at 1042. Thus, the City chose an inappropriate and unreasonable way to effectuate its public policy goals.

71.     In enacting the Ordinance, the City acted under the color of state law and is the direct and proximate cause of the violation of Uber Eats' constitutional rights.

72.     A declaration of the unconstitutionality and invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of Uber Eats' constitutional rights.

73.     Uber Eats seeks preliminary and permanent injunctive relief against enforcement of the Ordinance. Such a violation of Uber Eats' constitutional rights would constitute irreparable harm, which would only be compounded the longer the Ordinance is enforced.

74.     In light of this constitutional violation, Uber Eats also seeks monetary damages pursuant to 42 U.S.C. § 1983.

### COUNT II – VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 8 OF THE NEW YORK CONSTITUTION

75.     Plaintiff incorporates paragraphs 1 through 65 as if fully set forth herein.

76.     The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." The First Amendment applies to the states by virtue of the Fourteenth Amendment to the United States Constitution.

77.     Under *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011), when a government regulation requires one market actor to withhold consumer information from another (disfavored) market actor, the government has imposed a limitation on speech that triggers heightened scrutiny under the First Amendment. It follows that, where, as here, a government regulation requires one market actor to convey consumer information to another market actor, the government has imposed a requirement to speak that triggers heightened scrutiny under the First Amendment.

Indeed, whether a government forbids or compels speech is "without constitutional significance." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

78.    The Ordinance imposes such a regulation on Uber Eats and other third-party platforms, compelling them to disclose private consumer data about their users to New York City restaurants they contract with, in order to give those restaurants a competitive advantage at the expense of the platform.

79.    The Ordinance cannot withstand heightened scrutiny, let alone strict scrutiny. The Ordinance's "objective purpose and practical effect" is to benefit local restaurants by providing them with free access to valuable information, and to harm platforms like Uber Eats that own that information. *Sorrell*, 564 U.S. at 576–77. Such an interest is "incompatible with the First Amendment." *Id.* at 577. Even if the City's interest were substantial, compelled transmission of reams of customer data from one market actor to another, presuming the consent of the customer that owns the data, is not sufficiently tailored to achieve it. *See, e.g.*, *United States v. Caronia*, 703 F.3d 149, 168–69 (2d Cir. 2012). That is particularly true given the availability of more narrowly drawn alternatives. *See supra* ¶¶ 45, 70.

80.    For the same or similar reasons, the Ordinance also violates Article I, Section 8 of the New York Constitution.

81.    In enacting the Ordinance, the City acted under the color of state law and is the direct and proximate cause of the violation of Uber Eats' constitutional rights.

82.    A declaration of the unconstitutionality and invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of Uber Eats' constitutional rights.

83.     Uber Eats seeks preliminary and permanent injunctive relief against enforcement of the Ordinance. Such a violation of Uber Eats' rights would constitute irreparable harm, which would only be compounded the longer the Ordinance is enforced.

84.     In light of the federal constitutional violation, Uber Eats also seeks monetary damages pursuant to 42 U.S.C. § 1983.

## COUNT III – VIOLATION OF THE TAKINGS CLAUSE
## OF THE UNITED STATES CONSTITUTION AND
## ARTICLE I, SECTION 7 OF THE NEW YORK CONSTITUTION

85.     Plaintiff incorporates paragraphs 1 through 65 as if fully set forth herein.

86.     The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use "without just compensation." The Fifth Amendment applies to the states by virtue of the Fourteenth Amendment to the United States Constitution. Trade secrets recognized by state law are property rights protected under the Takings Clause. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984).

87.     Uber Eats' user data—which Uber guards with the significant privacy and data security protections and which reflects a compilation of customer identities, contact information, preferences, market trends, and other marketing information, all of which are difficult to replicate—qualifies as a trade secret under New York law.

88.     The Ordinance constitutes a non-categorical taking of Uber Eats' trade secrets, because the City has "restricted a property owner's ability to use his own property" by diminishing its primary economic value. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). The Ordinance interferes with Uber Eats' investment-backed expectations of exclusive and economic use of its consumer data by rendering null the substantial time and resources Plaintiff spent in marketing and advertising for purposes of developing and maintaining the data.

89.     The Ordinance forces the burden of providing an economic advantage to local restaurants solely onto Uber Eats and other private third-party platforms, without providing any compensation in return. This flies in the face of the Takings Clause, which intervenes when the government "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *E. Enterprises v. Apfel*, 524 U.S. 498, 522 (1998) (citation omitted).

90.     For these same or similar reasons, the Ordinance also violates Article I, Section 7 of the New York Constitution.

91.     In enacting the Ordinance, the City acted under the color of state law and is the direct and proximate cause of the violation of Uber Eats' constitutional rights.

92.     A declaration of the unconstitutionality and invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of Uber Eats' constitutional rights.

93.     Uber Eats seeks preliminary and permanent injunctive relief against enforcement of the Ordinance. Such a violation of Uber Eats' rights would constitute irreparable harm, which would only be compounded the longer the Ordinance is enforced.

94.     In light of these constitutional violations, Uber Eats also seeks just compensation in the form of monetary damages pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Article I, Section 7 of the New York Constitution.

### COUNT IV – VIOLATION OF THE DORMANT COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION

95.     Plaintiff incorporates paragraphs 1 through 65 as if fully set forth herein.

96.     The Commerce Clause prohibits government regulation that "imposes a burden on interstate commerce incommensurate with the local benefits secured." *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (citation omitted).

97.     By design, the Ordinance functions almost exclusively to the detriment of out-of-state third-party platforms, and it thus has a "disparate impact on [] non-local commercial entit[ies]." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 50 (2d Cir. 2007) (citation omitted). In this way, the Ordinance imposes a burden on interstate commerce "that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001).

98.     This burden placed on Uber Eats and other out-of-state third-party platforms, which is significant given their investment in developing user data and the foundational importance of user trust and confidence to their business, exceeds the purported local benefits. By pushing the disproportionate effects of the Ordinance onto out-of-state actors, the New York City Council ensured that it "will not bear the true political costs of their decisions, because those costs will fall in some measure on the residents of other political jurisdictions." *Id*.

99.     Finally, the City's purported interest in facilitating direct marketing efforts by and otherwise supporting local restaurants "could be promoted . . . with a lesser impact on interstate activities"—for example, by allowing restaurants to include direct marketing in the bags being delivered to consumers (something Uber Eats already permits) or by providing economic incentives (*e.g.*, tax breaks, loan programs, or grants) to local restaurants. *See id.* at 109 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

100.     In enacting the Ordinance, the City acted under the color of state law and is the direct and proximate cause of the violation of Uber Eats' constitutional rights.

101.     A declaration of the unconstitutionality and invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of Uber Eats' constitutional rights.

102.    Uber Eats seeks preliminary and permanent injunctive relief against enforcement of the Ordinance. Such a violation of Uber Eats' constitutional rights would constitute irreparable harm, which would only be compounded the longer the Ordinance is enforced.

103.    In light of this constitutional violation, Uber Eats also seeks monetary damages pursuant to 42 U.S.C. § 1983.

**COUNT V – VIOLATION OF ARTICLE IX, SECTION 2(C) OF THE NEW YORK CONSTITUTION, NEW YORK MUNICIPAL HOME RULE LAW SECTION 10(II)(A)(12), AND NEW YORK GENERAL CITY LAW SECTION 20(13)**

104.    Plaintiff incorporates paragraphs 1 through 65 as if fully set forth herein.

105.    Article IX, Section 2(c) of the New York Constitution, New York Municipal Home Rule Law Section 10(ii)(a)(12), and New York General City Law Section 20(13) permit the City to adopt laws to promote and protect the health, safety, and welfare of the local community, including by regulating local business. The Ordinance does the opposite—it threatens the privacy and security of the local community in order to provide a handout to certain favored local businesses.

106.    What's more, the grant of police power to the City is expressly limited, requiring any such regulation to "bear a reasonable relationship to the objective sought to be promoted." *Albany Area Builders Ass'n v. Town of Guilderland*, 141 A.D.2d 293, 298 (3d Dep't 1988), *aff'd*, 74 N.Y.2d 372 (1989). Here, the Ordinance has at most a "tenuous relationship" to its purported purpose of benefiting local restaurants and enabling them to engage in additional marketing efforts. *Id.* That is so not only because the Ordinance substantially harms Uber Eats and other third-party platforms and their users, but also because the City Council ignored simpler, more effective, and constitutional methods to provide additional benefits to local restaurants, whether through economic incentives (*e.g.*, tax breaks, loans, and grants) or by protecting forms of direct-to-

consumer marketing (*e.g.*, flyers in restaurant bags). Indeed, the significant public outcry over its passage is a testament to the Ordinance's flaws, both in terms of purpose and execution.

107.    A declaration of the unconstitutionality and invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of Uber Eats' rights.

108.    Uber Eats seeks preliminary and permanent injunctive relief against enforcement of the Ordinance. Such a violation of Uber Eats' rights would constitute irreparable harm, which would only be compounded the longer the Ordinance is enforced.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

i.      Declare that the Ordinance violates the Contract Clause, First Amendment, Takings Clause, and Dormant Commerce Clause of the United States Constitution; Article I, Section 7, Article I, Section 8, and Article IX, Section 2(c), of the New York Constitution; New York Municipal Home Rule Law Section 10(ii)(a)(12); and New York General City Law Section 20(13);

ii.     Preliminarily and permanently enjoin the City; its agencies, officers, agents, servants, employees, and attorneys; and all persons acting in concert or participation with them, from taking any actions to implement or enforce the Ordinance;

iii.    Award Plaintiff damages and just compensation for the violation of Plaintiff's constitutional rights and the taking of property;

iv.     Award Plaintiff its reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

-30-

v.      Award Plaintiff such other and further relief as the Court deems just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

Dated: New York, New York
      December 3, 2021

                                                  Roberta A. Kaplan
                                                  John C. Quinn
                                                  Matthew J. Craig
                                                  Sofia G. Syed
                                                  KAPLAN HECKER & FINK LLP
                                                  350 Fifth Avenue, 63rd Floor
                                                  New York, New York 10118
                                                  (212) 763-0883
                                                  rkaplan@kaplanhecker.com
                                                  jquinn@kaplanhecker.com
                                                  mcraig@kaplanhecker.com
                                                  ssyed@kaplanhecker.com

                                                  *Attorneys for Plaintiff Portier, LLC*